FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

2011 MAY 10  P 2: 02

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the COMMONWEALTH OF VIRGINA *ex rel.* CHRISTINE RIBIK, NADINE KELLY, and STEPHANIE BEAUREGARD, | ) ) ) ) ) | Case No: 1:11CV496-AJT/TCB<br><br>*unseal* 2/12/13 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | FILED UNDER SEAL<br>DO NOT PLACE IN PRESS BOX<br>DO NOT ENTER ON PACER |
| FAIRFAX NURSING CENTER, INC., ROBERT BAINUM, and CHARMAINE BAINUM, | ) ) ) ) | |
| Defendants. | ) ) | DEMAND FOR JURY |

## *QUI TAM* COMPLAINT

Relators Christine Ribik, Nadine Kelly, and Stephanie Beauregard, on behalf of themselves, the United States of America, and the Commonwealth of Virginia, allege and claim against Defendants Fairfax Nursing Center, Inc., Robert Bainum, and Charmaine Bainum as follows:

## JURISDICTION AND VENUE

1.    This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act"). Accordingly, this Court has jurisdiction



pursuant to 28 U.S.C. § 1331. Jurisdiction is also authorized over both federal and state law claims under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the Commonwealth of Virginia, transact substantial business in the Commonwealth of Virginia, transact substantial business in this judicial district, and can be found here. Additionally, as described herein, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729. Specifically, Defendants submitted or caused to be submitted in this judicial district false claims for improper therapy services and made or used false records or statements material to those false claims.

## PARTIES

3.     Defendant Fairfax Nursing Center, Inc. (FNC) is a Virginia corporation with its principal place of business in Fairfax, Virginia. FNC is a Medicare-licensed skilled nursing facility (SNF) and offers skilled nursing services – including physical, occupational, speech, and other therapy services – to Medicare and Medicaid patients.

4.     FNC is owned and operated by Defendants Robert and Charmaine Bainum (the Bainums), who own and operate several healthcare

2

facilities in the area, including The Gardens at Fair Oaks and The Woodlands Retirement Community.

5.     At all times relevant to this Complaint, the Bainums had actual or apparent authority to submit bills on behalf of FNC to the United States for payment and to submit certifications to the United States regarding FNC's compliance with Medicare regulations.

6.     Since at least 2009, FNC has operated its business with the intent to fraudulently boost its Medicare and Medicaid reimbursements by performing unnecessary, often harmful therapy services and by improperly billing under the Medicare and Medicaid skilled nursing benefits for unskilled services that are not calculated to achieve any legitimate health care goals.

7.     Relator Christine Ribik is a licensed occupational therapist of 28 years' experience.   Ms. Ribik has performed and supervised the performance of occupational therapy in diverse clinical environments and has operated her own occupational therapy business for many years.   Ms. Ribik was employed by FNC in April, 2009, and immediately became aware that FNC operates its business with the fraudulent intent of boosting profits by billing the United States and the Commonwealth of Virginia for unnecessary, unskilled therapy services.

3

8.     Relator Nadine Kelly holds Masters degrees in Special Education and Speech and Language Pathology.  She has been a licensed clinical speech and language pathologist for 20 years and has served as a teacher and an instructor of speech and language pathology.  Ms. Kelly was hired as a speech therapist by FNC in October 2006.  Throughout her employment, Ms. Kelly witnessed first-hand FNC's practices of performing, recording, and billing for therapy services that were never in fact performed or that amounted to unskilled, non-billable, services.

9.     Relator Stephanie Beauregard has been a licensed physical therapist for over 5 years.  Ms. Beauregard has broad experience in the design and performance of physical rehabilitation plans for therapy patients of all kinds, particularly those suffering from neurological impairments.  Ms. Beauregard began employment with FNC in September 2009.  Through her experience as an FNC therapist, Ms. Beauregard has become acutely aware that FNC makes its treatment decisions solely on the fraudulent basis of increasing its billing to the United States, without regard to patient well-being or the requirements of the Medicare program.

10.     Relators file this Complaint on behalf of themselves, the United States, and the Commonwealth of Virginia. Relators are the original source of the information contained in this Complaint as defined by the *qui*

4

*tam* provisions of the False Claims Act and the Virginia Fraud Against Taxpayers Act, VA. CODE § 8.01-216.5.

11.    Prior to filing this Complaint under seal, Relators served upon the United States and the Commonwealth of Virginia a written disclosure of all material evidence and information upon which this claim is based.

## MEDICARE AND MEDICAID COVERAGE FOR SKILLED THERAPY

**A.    Background**

12. Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

13.    Through Medicare Part A hospital insurance, Medicare pays for skilled rehabilitative therapy provided as part of a patient's physician-prescribed hospital or post-hospital skilled nursing facility plan of care.

14. In order to qualify for skilled nursing coverage, a patient otherwise appropriate for Medicare must show a qualifying hospital stay of three or more days within the 30 days prior to entering the skilled nursing facility. *See* 42 C.F.R. 409.30. A physician must order procedures for the patient that are appropriate to be performed only in a Skilled Nursing

5

Facility (SNF), such as rehabilitative therapy, and must certify that the patient's condition is such that he or she can practically be cared for only in a SNF. *Id.* In so certifying, the physician must determine that the patient's condition should improve or achieve stability in response to skilled care. *Id.*

15.    Upon satisfaction of those requirements, Medicare will pay for 100 days of skilled nursing care per-patient, per-illness period, so long as the patient continues to require and benefit from skilled care on a daily basis (though, after 20 days, a coinsurance payment is required of the patient). *Id.*

## B.    The Skilled Nursing Facility Prospective Payment System

16.    Medicare pays for skilled nursing care by way of a prospective payment system (the "PPS"). Under the PPS, SNFs receive a per-patient, per-diem payment from CMS. The payment is based upon a prospectively determined federal rate that is intended to cover the entire cost of the patient's care at the facility. *See* 42 U.S.C. § 1395yy.

17.    In order to account for the relative costs of treating patients with different clinical conditions and needs, the prospective rate is subject to a "case-mix-adjustment." *Id.* The case-mix-adjustment is determined by way of individual patient assessments mandated by CMS and performed by the SNFs. *See* 42 U.S.C. § 1395i–3.

18. In additional to an initial assessment, SNFs are required to perform periodic assessments using the resident assessment instrument ("RAI") adopted by the State by which they are licensed, which must incorporate a "uniform minimum data set" (the "MDS") established by CMS. See id.; 42 C.F.R. § 483.20.

19. The assessment process "must include direct observation and communication with the resident, as well as communication with licensed and non-licensed direct care staff members on all shifts." Id.

20. Assessments must be conducted on the 5th, 14th, 30th, 60th, and 90th days of post-hospital SNF care and following any material change in the patient's condition. See 42 C.F.R. § 413.343. Each patient must be re-certified by a physician as eligible for extended care no later than the fourteenth day of inpatient extended care services, then at least every thirty days thereafter. See 42 C.F.R. 409.30.

21. The patient's assessment data is used to place the patient in a "resource utilization group" (RUG) as established by CMS and published each year in the Federal Register. See 42 C.F.R. § 409.30. A given RUG describes a population of patients with similar characteristics whose care is expected to cost roughly the same amount.

7

22.   The current RUG III system delineates initially between patients who require or are expected to require graduated amounts of rehabilitative therapy, measured in minutes. *See, e.g.,* MEDICARE PROGRAM; *Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities for FY 2011,* 75 Fed. Reg. 42886 (July 22, 2010). SNFs may estimate required therapy minutes in their initial assessment; thereafter, a patient's RUG level is tied to the number of therapy minutes actually performed. *Id.*

23.   On that basis, a patient will fall into categories of ultra high, very high, high, medium, and low therapy categories. For example, a patient in the very high category must receive between 500 and 719 therapy minutes per 7 days; a patient receiving 720 minutes falls into the ultra high category. Accordingly, a patient's RUG level – and therefore the SNF's reimbursement level – may change between assessments depending on how many therapy minutes the patient actually receives.

24.   Along with therapy requirements, the MDS measures 16 other aspects of a patient's clinical and functional condition. Patients exhibiting certain conditions or characteristics are expected to require more care and are therefore placed into RUGS that carry a higher reimbursement.

## C.   SNF Program and Reimbursement Requirements

8

25.     Medicare regulations require the SNF medical staff to write a plan of care for each skilled nursing patient based upon the individual's needs and circumstances.  *Id.* The patient's care plan must be designed by a physician or by the licensed physical therapist who actually performs the services and must describe the type, length, frequency, and duration of treatment. 42 C.F.R. §§ 409.23; 409.17.

26.     To qualify for reimbursement – and to constitute legitimate therapy for purposes of MDS assessments – therapeutic care must actually require the skill of a professional:  "the services must be of a level of complexity or sophistication, or the condition of the patient must be of a nature that requires the judgment, knowledge, and skills of a qualified physical therapist." *See* MEDICARE BENEFIT POLICY MANUAL, Chapter 8, § 30.4.1.1[1]; *see also* 42 C.F.R. § 409.32.    Specifically, "services involving activities for the general good and welfare of the patient (e.g. general exercises to promote overall fitness and flexibility and activities to provide diversion and general motivation) do not constitute skilled physical therapy." *Id.*

27.  Virginia  regulations  provide  for  substantially  similar requirements and limitations on therapy services as those set forth above.

---

[1] http://www.cms.gov/manuals/Downloads/bp102c08.pdf

*See* 12 Virginia Administrative Code § 30-50-200.   The *Virginia Administrative Code* provides, *inter alia*, as follows:

> [Therapy] [s]ervices shall be furnished under a written plan of treatment and must be established, signed and dated (as specified in this section) and periodically reviewed by a physician. The requested services or items must be necessary to carry out the plan of treatment and must be related to the patient's condition.
>
> * * *
>
> Utilization review shall be performed to determine if services are appropriately provided and to ensure that the services provided to Medicaid recipients are medically necessary and appropriate. Services not specifically documented in the patient's medical record as having been rendered shall be deemed not to have been rendered and no coverage shall be provided.
>
> * * *
>
> Physical therapy, occupational therapy and speech-language services are to be considered for termination regardless of the preauthorized visits or services when any of the following conditions are met:
>
> No further potential for improvement is demonstrated. (The patient has reached his maximum progress and a safe and effective maintenance program has been developed.)
>
> There is limited motivation of the part of the individual or caregiver.
>
> The individual has an unstable condition that affects his or her ability to participate in a rehabilitative plan.

Progress toward an established goal or goals cannot be achieved within a reasonable period of time.

The established goal serves no purpose to increase meaningful functional or cognitive capabilities.

The service can be provided by someone other than a skilled rehabilitation professional.

28.     In addition to the specific requirements of the SNF PPS, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.*; 42 C.F.R. § 410.50. Medicare providers may not bill the United States – or the Virginia Medicaid program – for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

29.     To enroll as a Medicare provider, FNC was required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A.   In submitting Form 855A, FNC made the following "Certification Statement" to CMS:

I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's

11

compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

30.    Upon qualifying, FNC billed Medicare by submitting a claim form (CMS Form 1450) to the fiscal intermediary ("FI") or Medicare Administrative Contractor ("MAC") responsible for administering Part A Medicare claims on behalf of the United States. See CMS Form 1450. Each time it submitted a claim to the United States through the FI, FNC certified that the claim was true, correct, and complete and complied with all Medicare laws and regulations.

## DEFENDANTS' FRAUDULENT SCHEMES

31.    Defendants have perpetrated a fraudulent scheme to falsely inflate their patients' PPS scores and to falsely bill Medicare and Medicaid for therapy services that do not qualify as such, are not medically necessary or appropriate, or both.

32.    FNC consistently performs medically unnecessary, potentially harmful therapy procedures on patients; bills for patients who do not qualify for the skilled nursing benefit; and systematically records and bills for skilled therapy while actually providing unskilled services – all in an effort to place patients in more lucrative RUG groups and to receive fraudulently inflated PPS payments.

12

a. **Ordering and Performing Unnecessary Therapy – Billing for Patients Who Do Not Qualify for the SNF Benefit**

33.   Defendants perpetrate their fraud in part by performing therapy services on patients who simply do not require those services or cannot benefit from them, and who thus do not qualify for the Medicare skilled nursing benefit.

34.   By performing and recording these unnecessary services that are not tied to any legitimate care plan, Defendants fraudulently inflate PPS payments and bill for medically unnecessary services and for services provided to non-qualifying patients, in violation of 42 C.F.R. 409.30 and 42 U.S.C. §1395y(a)(1)(A).

35.   In furtherance of their scheme, FNC management makes clear to FNC staff that patients are to be "skilled" for the full 100 days, regardless of the patient's condition, any reasonable goals for therapeutic care, or the patient's progress in treatment.

36. Relators have consistently heard Huntz and Rochen-Busch mischaracterize the Medicare skilled nursing benefit in conversation with both patients and staff, deliberately creating the false impression that Medicare automatically covers 100 days of skilled care (when, in reality, it covers skilled care only where such care is medically necessary and will achieve stability or improvement of a patient's condition).   Huntz and

13

Rochen-Bush tell staff to "find a reason to keep" patients even if they do not need skilled care.

37.    In fact, as described more specifically *infra*, FNC management pushes physical, occupational, and often speech therapy on nearly every patient, even though such treatment is not part of a legitimate plan of care.

38.    Additionally, FNC management consistently refuses to discharge patients who can no longer benefit from skilled therapy on a daily basis – and who therefore do not qualify for the SNF benefit and cannot legally be billed to the United States or the Commonwealth of Virginia. *See* 42 C.F.R. 409.30.

39.    Relators have each been chastised by FNC management for recommending a patient's discharge or for discussing discharge with patients.   On numerous occasions, patients whom Relators refused to treat due to impropriety were transferred to other therapists who were ordered to perform therapy.  For example, Plaintiff-Relator Nadine Kelly began seeing patient M.W. on or about February 23, 2011.  M.W. had suffered from a stroke and Ms. Kelly quickly concluded that she would make no more progress in therapy, as she showed no improvement.  M.W. and her family requested that M.W. be discharged to her home by March 24, 2011 and M.W. declined further speech therapy in the interim.  When Ms. Kelly

14

informed Huntz, Huntz reprimanded her for agreeing to allow M.W. the freedom to refuse therapy. Huntz immediately ordered another, less experienced therapist to "find a way" to keep M.W. on all three disciplines until her discharge. As a result, M.W.'s RUG score and was falsely inflated and the United States falsely billed for unnecessary therapy.

40.    On another occasion, Plaintiff-Relator Beauregard was threatened with termination for discussing discharge with a patient who no longer required therapy. She was ordered to apologize to Huntz and Rochen-Busch and effectively beg for her job.

41.    The following are examples of patients who were "skilled" by FNC and billed to the United States under the skilled nursing benefit though the patients were not appropriate for therapy and derived no benefit from the services provided:

42.    Patient M.S., 97, was admitted to FNC's skilled service despite a recommendation for hospice. FNC developed and recorded a care plan for M.S. that included speech, occupational, and physical therapy. In reality, M.S. required total, 24 hour care – M.S. had a private 24 hour care giver – and was unable to benefit from therapy at all. M.S. suffered from sepsis, respiratory distress, pleural effusion, congestive heart failure, atrial fibrillation, and other acute conditions that contributed to her near-complete

15

debility.   In fact, the FNC physical therapist merely lifted M.S. into a recliner and performed unskilled exercises.   M.S.'s daughter demanded that M.S. be discharged – though FNC billed for the full 20 days of 100% Medicare reimbursement.  M.S. died shortly thereafter.

43.   Patient S.M. had terminal cancer but was readmitted to FNC's service multiple times, beginning in or around April, 2009.  S.M. displayed no progress and consistently refused therapy.   Nonetheless, Huntz and Rochen-Busch insisted that Plaintiff-Relator Beauregard continue to perform therapy on S.M.; Huntz and Rochen-Busch consistently pressured therapists to force care on patients who were terminal and could not benefit from it. FNC billed Medicare for S.M.'s 100 Part A benefit days and began billing under Medicare Part B.   In October, 2009 Plaintiff Relator Beauregard informed FNC that she refused to perform physical therapy on S.M. because S.M. was dying.  S.M. died shortly thereafter, on or about October 24, 2010.

44.   Patient B.E. was severely demented and suffering from a fractured patella.  Relator Ribik recommended that B.E. be discharged on the ground that B.E. had extremely limited potential to benefit from therapy. Instead, FNC management assigned B.E. to, James Hamilton (Hamilton), an occupational therapy assistant, who performed 100 days of Medicare Part A therapy and began billing under Part B.  In fact, the care provided to B.E.

was unskilled – largely amounting to pedaling a restorator – and amounted to respite care. Hamilton was not properly supervised by a licensed therapist as required by Medicare. Furthermore, upon information and belief Hamilton was not a duly licensed therapy assistant.

45. Patient J.B. was a long term care resident of FNC. J.B. was frequently hospitalized and consistently "skilled" after each hospitalization. J.B. had suffered from multiple strokes and severe debility and was completely unable to regain functionality and derived no benefit from the therapy FNC performed. Yet, FNC billed for J.B.'s full 100 Medicare Part A therapy days and, once they were exhausted, began billing under Medicare Part B for occupational therapy. J.B. made no improvements and still requires maximum assistance for all activities of daily living. Plaintiff-Relators frequently observed FNC occupational therapist Deborah Harvey performing unskilled therapy on J.B., activities such as feeding that are not skilled and were not designed as therapeutic.

46. Patient A.S. was referred in very poor medical condition, suffering from stroke and Parkinson's disease. Nonetheless, FNC management "RUGed" him at a high level by mandating that Relator Nadine Kelly perform speech therapy on A.S. On or around June 27, 2010, Ms. Kelly refused, on the basis that A.S. was near death and was inappropriate

for speech therapy. FNC refused to discharge A.S. and transferred A.S. to a less experienced speech therapist who was coerced into performing therapy. A.S. died before he could be transferred to hospice care.

**b.      Ordering Therapy Without Patient Assessments or Plans of Care**

47.      Defendants also effectuate their fraud through direct manipulation of RUG scores. Medicare regulations require that an initial assessment be performed on each patient and that a plan of care be designed to meet that patients' care needs and goals. *See* 42 C.F.R. §§ 409.23; 409.17 (emphasis added). In violation of those regulations, Defendants effectively assign patients to desired RUG groups by ordering therapy minutes prior to assessment and without respect to the patients' actual condition.

48.      Upon the referral of a new patient, Huntz and Rochen-Busch simply command Relators and other FNC therapists to perform a certain number of therapy minutes on the patient. Rather than allowing its therapists to evaluate patients and design an appropriate plan of care as required by Medicare regulations (*See* 42 U.S.C. § 1395i–3; 42 C.F.R. § 483.20; 42 C.F.R. §§ 409.23; 409.17),   FNC management dictates in advance the treatment each patient will receive. The number of minutes assigned by management is not based upon the requisite observation or

evaluation of the patient, but merely upon the desired RUG – and reimbursement – level. As a result, the number of therapy minutes received by the patient between assessments is artificially inflated, leading to a commensurately higher RUG score.

49.     For example, patient L. was admitted on or about July 2, 2009. FNC management "RUGed" L. for 60 minutes of occupational therapy and 60 minutes of Physical Therapy. In fact, L. was completely incapable of that level of physical activity. L.'s oxygen saturation measurements dipped dangerously low when L. was merely transferred to a bedside toilet. L. refused further therapy; FNC nonetheless billed Medicare until approximately July 27, 2009 – obtaining her full 20 day benefit.

50.     Patient M.D. was admitted to FNC on multiple occasions beginning in 2009. On or about July 21, 2009, M.D. was re-admitted and "RUGed" for 55 minutes of physical therapy and for occupational therapy. At that time, M.D. was suffering from renal failure and underwent dialysis three times a week. He was not physically capable of performing therapy or improving; frequently he slept during occupational therapy and during his "physical therapy," which consisted of the exercise bike.

51.     Patient Z.B. was admitted under the Medicare Part B therapy benefit on or about October 6, 2009 with arthritis and a contracted hand. He

19

was fitted with a prefabricated splint and ordered to occupational therapy five times a week for fitting and instruction by an occupational therapist. In reality, this process could have been completed would have taken a few minutes and could have been performed by a nursing aide – even if Z.B. could have benefited from it in spite of his severe dementia. Nonetheless, FNC billed Medicare under Part B for the useless therapy.

c.      **Recording and Billing for Unskilled Services**

·52.      FNC's therapists consistently record therapy minutes – which inflate RUG scores and PPS billings to the United States – for activities that do not constitute skilled therapy.

53.      FNC often requires that its therapists perform an unrealistic number of therapy minutes, leaving them little choice but to attempt to perform therapy on several patients at once.

54.      Additionally, as described above, FNC orders its therapists to perform therapy on patients who do not require it; therapists are thus left to simply find something to do with the patient.

55.      As a result, the majority of therapy performed by FNC's therapists amounts to, at best, unskilled group exercise and, at worst, patient abuse. The following are illustrative:

56.   Relators commonly witness FNC occupational therapists recording therapy minutes for watching patients dress themselves. These patients were fully capable of dressing and did not require skilled occupational therapy. Nevertheless, in violation of 42 C.F.R. §§ 409.23; 409.17, and at the direction of FNC management, the FNC therapists recorded these activities as skilled therapy, directly resulting in higher RUG classification for the patients, who continued to receive unnecessary care.

57.   FNC therapists frequently perform "therapy" on several patients at once, under circumstances that eliminate all possibility of skilled treatment or patient benefit. For example:

58.   FNC physical therapists regularly record therapy minutes on several patients at once, when, in actuality, one or more of their patients is not being monitored at all and is often sleeping. (It commonly occurs that FNC therapists place patients on restorator bikes – sets of exercise pedals – while "walking" other patients. The patients on the restorators are not timed or fitted with a blood pressure cuff and no attempt is made to monitor performance or improvement. Very often these patients fall asleep on their equipment.) The recorded therapy is not skilled but serves to inflate each patient's therapy minutes and RUG scores, in violation of 42 C.F.R. §§ 409.23; 409.17 and 42 U.S.C. § 1395y(a)(1)(A).

21

59.   Very often, patients who have very little mobility or functionality – who may be completely debilitated and close to death – and who have no prospect of gaining or regaining same are literally dragged around the facility in the name of therapy.  The task requires no skill as required by 42 C.F.R. §§ 409.23; 409.17 and provides no benefit, yet it is recorded by FNC therapists as skilled therapy, resulting in falsely inflated RUG scores and PPS payments.

60.   As a result of Defendants' tactics, nearly every patient currently on the rolls of FNC is "RUGed" at an "ultra high" or "very high" therapy level – even though many of these patients do not require and are not appropriate for high volumes of physical, occupational, or speech therapy.

61.   Consultant Shelley Measure, OTR/L, incessantly instructs therapists – in direct contravention of 42 C.F.R. §409.23 – that "if you [the therapist] are touching a patient, that's treatment."

**d.   Billing for Services Provided by Unlicensed Personnel**

62.   In violation of 42 C.F.R. § 409.17, FNC has for some time been billing for therapy services provided by Hamilton, who is not a licensed occupational therapist or occupational therapy assistant under the requirements of 42 C.F.R. § 484.4.

22

63.   In order to conceal their fraud, Defendants at one time required Hamilton to wear a false badge that identified him as a certified occupational therapy assistant or an occupational therapist.

64.   In fact, FNC was aware that Hamilton was not a licensed or certified occupational therapy assistant until at least December, 2010, and Defendants' bills for his services were in violation of 42 C.F.R. § 409.17 and are false and fraudulent.

65.   By and through their actions described herein, Defendants have perpetrated a fraud on the United States and the Commonwealth of Virginia, endangered their patients, and placed additional strain on the already overburdened Medicare and Medicaid programs.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED
## FALSE CLAIMS UNDER 31 U.S.C. § 3729

66.   Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

67.   By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

23

68.     Through their requests for payment via CMS Form 1450 or otherwise, Defendants submitted false claims for SNF PPS payments that were fraudulently inflated by therapy services that were not medically necessary, in violation of 42 U.S.C. § 1395y(a)(1)(A);

69.     Through their requests for payment via CMS Form 1450 or otherwise, Defendants submitted false claims for SNF PPS payments for patients who did not qualify for the skilled nursing benefit, in violation of 42 C.F.R. 409.30.

70.     Through their requests for payment via CMS Form 1450 or otherwise, Defendants submitted false claims for SNF PPS payments that were fraudulent inflated by therapy services that did not amount to skilled therapy, in violation of *See* 42 C.F.R. 409.20 and 42 U.S.C. § 1395y(a)(1)(A).

71.     Through their requests for payment via CMS Form 1450 or otherwise, Defendants submitted false claims for SNF PPS payments that were fraudulent inflated by therapy services that were never performed, in violation of 42 C.F.R. 409.20 and 42 U.S.C. § 1395y(a)(1)(A).

72.     The United States paid the false claims described herein.

73.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to

Defendants by the United States through Medicare and Medicaid for such false or fraudulent claims.

WHEREFORE, Relators request entry of judgment in their favor on behalf of the United States, and against Defendants Fairfax Nursing Home, Inc., Robert Bainum, and Charmaine Bainum in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT TWO
## MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

74.    Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

75.    By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:

76.    Defendants made and used false records reflecting therapy services that were not medically necessary, did not qualify as skilled

25

services, or were rendered to patients who did not qualify under the Medicare skilled nursing benefit, all in violation of 42 U.S.C. § 1395y(a)(1)(A) and the Medicare regulations cited *supra*;

77. Defendants made and used false CMS Forms 1450 that reflected fraudulently inflated RUG scores and were intended to – and did – elicit fraudulently inflated SNF PPS payments;

78. Defendants made and used false CMS Forms 1450 and 855A and other false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid when in fact Defendants intended to – and did – defraud the Medicare system by falsely claiming inflated SNF PPS payments.

79. The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to the United States.

80. In reliance upon Defendants' false statements and records, the United States paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

81. Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to

Defendants and others by the United States for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT THREE
## PRESENTING OR CAUSING TO BE PRESENTED
## FALSE CLAIMS UNDER VA. CODE § 8.01-216.3

82.    Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

83.    By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented to an employee of the Commonwealth of Virginia false or fraudulent claims for payment or approval, to wit:

84.    Through their requests for payment from the Virginia Medicaid system, Defendants submitted false claims for therapy services that did not form a part of any legitimate plan of care and were not medically necessary

27

and appropriate, in violation of 12 VIRGINIA ADMINISTRATIVE CODE § 30-50-200.

85.   Through their requests for payment from the Virginia Medicaid system, Defendants submitted false claims for therapy services that did not amount to skilled therapy, in violation of 12 VIRGINIA ADMINISTRATIVE CODE § 30-50-200.

86.   Through their requests for payment from the Virginia Medicaid system, Defendants submitted false claims for therapy services that were never performed, in violation of 12 VIRGINIA ADMINISTRATIVE CODE § 30-50-200.

87.   The Commonwealth of Virginia paid the false claims described herein.

88.   By and through the actions described *supra*, Defendants knowingly made, used, or caused to be made or used, false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the Commonwealth of Virginia through the Medicaid program and submitted false or misleading information or statements to the Virginia Medicaid program for the purpose of being accepted as a Medicaid provider.

89.   Defendants' fraudulent actions described herein have resulted in damage to the Commonwealth of Virginia equal to the amount paid or reimbursed to Defendants by the Commonwealth of Virginia through Medicaid for such false or fraudulent claims.

WHEREFORE, Relators requests entry of judgment in their favor on behalf of the Commonwealth of Virginia, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by VA. CODE § 8.01-216.3, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

## COUNT FOUR
## MAKING OR USING FALSE RECORDS OR STATEMENT TO GET FALSE CLAIMS PAID UNDER
## VA. CODE § 8.01-216.3

90.   Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

91.   By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements to get a false

or fraudulent claim paid or approved by the Commonwealth of Virginia, to wit:

92.     Defendants made and used false records reflecting therapy services that were not a part of any legitimate care plan, were not medically necessary or appropriate, or did not qualify as skilled services, all in violation of 12 VIRGINIA ADMINISTRATIVE CODE § 30-50-200.

93.     Defendants made and used false bills and requests for payment to the Virginia Medicaid Program reflecting fraudulent physical therapy services.

94.     Defendants made and used false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the Commonwealth of Virginia through Medicare or Medicaid when in fact Defendants intended to – and did – defraud the Medicaid system by submitting false claims for improper therapy services.

95.     The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to the Commonwealth of Virginia.

96.     In reliance upon Defendants' false statements and records, the Commonwealth of Virginia paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

30

97. Defendants' fraudulent actions described herein have resulted in damage to the Commonwealth of Virginia equal to the amount paid or reimbursed to Defendants and others by the Commonwealth of Virginia for such false or fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the Commonwealth of Virginia, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by Va. Code § 8.01-216.3, attorneys' fees and costs, and such other, different, or further relief to which Relators may be entitled.

### COUNT FIVE
### "REVERSE FALSE CLAIMS" UNDER
### 31 U.S.C. § 3729(a)(1)(G) AND VA.
### CODE § 8.01-216.3

98. By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, a false records or statements material to an obligation to pay or transmit money or property to the United States or the Commonwealth of Virginia, or knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States or the Commonwealth of Virginia, to wit:

31

99.   Defendants knew that they had received millions of dollars in SNF PPS payments based on falsely inflated RUG scores, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

100.   Defendants knew that they had received millions of dollars in SNF PPS payments for care provided to patients who did not qualify for the skilled nursing benefit and could not benefit from therapy, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

101.   Defendants knew that they had received millions of dollars in SNF PPS payments for unskilled services that did not constitute skilled therapy, yet Defendants took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States;

102.   As a result of Defendants' fraudulent conduct, the United States has suffered damage in the amount of funds that belong to the United States but are improperly retained by Defendant.

WHEREFORE, Plaintiff-Relators demand judgment in their favor on behalf of the United States and the Commonwealth of Virginia, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and VA. CODE § 8.01-216.3, attorneys' fees and costs, and such other, different, or further relief to which Plaintiff-Relators may be entitled.

## COUNT SIX
## CONSPIRACY UNDER 31 U.S.C. § 3729(a)(2) AND VA. CODE § 8.01-216.3

103.   Relators adopt and incorporate the previous paragraphs as though fully set forth herein.

104.   Defendants knowingly presented, or caused to be presented, to officers and employees of the United States and the Commonwealth of Virginia, false or fraudulent claims for payment or approval, to-wit: Defendants knowingly submitted and caused to be submitted false claims for improper and medically unnecessary therapy services.

105.   The United States and the Commonwealth of Virginia paid Defendants for such false claims.

106.   Defendants, in concert with their principals, agents, employees, and other institutions did agree to submit such false claims to the United States and the Commonwealth of Virginia.

107. Defendants and their principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States and the Commonwealth of Virginia by submitting false claims for payment to the United States and the Commonwealth of Virginia through Medicare and Medicaid.

108. Defendants' fraudulent actions, together with the fraudulent actions of their principals, agents and employees, have resulted in damage to the United States and the Commonwealth of Virginia equal to the amount paid by the United States and the Commonwealth of Virginia to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Relators demand judgment in their favor on behalf of the United States and the Commonwealth of Virginia and against Defendants in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and VA. CODE § 8.01-216.3, attorneys' fees, costs, interest, and such other, different, or further relief to which Relators may be entitled.

Date: May ___, 2011.

STEPHEN R. PICKARD
VA BAR # 16374
Counsel for Plaintiff-Relators
Stephen R. Pickard, P.C.

34

115 Oronoco Street
Alexandria, VA 22314
Telephone: (703) 836-3505
srpickard@aol.com


/s/ Henry I Frohsin
HENRY I FROHSIN (Pro Hac Vice)
JAMES F. BARGER, JR. (Pro Hac Vice)
J. ELLIOTT WALTHALL (Pro Hac Vice)
FROHSIN & BARGER, LLC
One Highland Place
2151 Highland Avenue, Suite 310
Birmingham, Alabama 35205
Telephone: (205) 933-4006
henry@frobar.com
jim@frobar.com
elliott@frobar.com

Counsel for Plaintiff-Relators




## RELATORS DEMAND A TRIAL BY JURY

# CERTIFICATE OF SERVICE

On this the _____ day of May 2011, Plaintiff-Relators hereby certify that in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of the *Qui Tam* Complaint has been executed as follows:

**By Registered Mail/Return Receipt to:**

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Neil H. MacBride, U.S.A.
United States Attorney's Office
Justin W. Williams United States Attorney's Building
2100 Jamieson Ave
Alexandria, VA 22314

Kenneth T. Cuccinelli, II, A.G.
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

_____
OF COUNSEL

36